## PHILIP A. RYAN LUMBER CO. v. BALL.
### (No. 7313.)

(Court of Civil Appeals of Texas. Galveston. June 15, 1917. Rehearing Denied Oct. 4, 1917.)

1. RAILROADS ⬢⟿138—"CONNECTION."

A contract for a connection between railroads means a physical joining of the rails so as to permit trains to pass from one set of rails to the other.

[Ed. Note.—For other definitions, see Words and Phrases, Connection.]

2. LOGS AND LOGGING ⬢⟿3(9)—CONTRACTS—CONSTRUCTION—CONTINGENCIES.

Under contract for the sale of timber by which vendor agreed to use his best efforts to obtain a railroad right of way to permit removal of the timber and to obtain a connection with another railway, there was no absolute liability of either party until the connection was secured and accepted.

3. LOGS AND LOGGING ⬢⟿3(9)—CONTRACTS—CONSTRUCTION—CONTINGENCIES.

The mere fact that the vendor's agent could have secured the right of way, and did not at the vendor's suggestion, did not change the liability of the parties.

4. EMINENT DOMAIN ⬢⟿11—WHO MAY EXERCISE.

An individual cannot exercise the right of eminent domain in view of Const. art. 1, § 17, and Rev. St. 1911, arts. 6504–6530, and article 6481 delegating such right to railroad corporations.

5. RAILROADS ⬢⟿1—RIGHT TO OWN AND OPERATE—FOREIGN CORPORATIONS.

A foreign corporation, having made a contract to buy lumber and operate a railroad to remove the lumber and having a permit only to engage in the lumber and logging business, had no power to operate the railroad in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 6406, providing that no corporation except one chartered under the laws of Texas shall be permitted to operate, or maintain any railway, so that its contract was for an illegal purpose and unenforceable.

6. RAILROADS ⬢⟿2—"RAILWAY."

A railroad laid down for the purpose of removing logs sold by the vendor to be owned by the individual vendor and operated by a foreign corporation without authorization was a railway within the meaning of Vernon's Sayles' Ann. Civ. St. 1914, art. 6406, prohibiting any but a Texas corporation to operate such a road.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Railway.]

Appeal from District Court, Anderson County; John S. Prince, Judge.

Suit by the Philip A. Ryan Lumber Company against P. D. C. Ball. Judgment for defendant, and plaintiff appeals. Affirmed.

See, also, 177 S. W. 226.

R. E. King, of Memphis, and Thos. B. Greenwood, of Palestine, for appellant. N. B. Morris, of Palestine, Lyon & Swarts, of St. Louis, Mo., and W. J. J. Smith, of Dallas, for appellee.

GRAVES, J. This suit was brought in the district court of Anderson county by appellant, Philip A. Ryan Lumber Company, against appellee, P. D. C. Ball, for damages in the sum of $61,500, for breach of a written agreement or contract of sale of ash, oak, cottonwood, and elm timber on Trinity river in Anderson county, the building of a railroad being a constituent part thereof, dated March 20, 1912, which resulted in a judgment for appellee, after submission of the case to a jury upon special issues; and to seek revision of that judgment, this appeal is prosecuted.

In appropriate places hereinafter the parts

of the contract deemed material will be more fully referred to. The relevant consideration at this beginning point is that the sole cause of action declared upon was the alleged right to damages for refusal to sell the timber contracted for; the measure being stated at the difference between the contract price of the timber and its market value, and the amount being laid at the sum already given. There was no allegation of any other or special damage suffered, nor expense incurred, by reason of any other wrongful or fraudulent act. Among other defenses the appellee answered that the obligations of the contract declared upon had never in fact become binding upon either party to it, because, while he had in good faith used his best efforts to do so, he had never been able to obtain the right of way and connection for the contemplated railroad provided for therein, which he alleged were indispensable conditions precedent to the imposing of any binding obligation under the contract upon either party; and, further, because it was an illegal contract, and its performance, at least in so far as appellant was concerned, directly prohibited by a statute of Texas, hereinafter set out.

If the instrument sued upon under the proof offered, without reference to the time when it was to become effective, whether on April 15th, or May 30th, or July 6th, the alleged extension dates never became, nor by the properly construed meaning and effect of its terms could ever become, a binding obligation upon either party until both such right of way and connection as were specified as conditions precedent had been first secured, and they were in fact not secured, then no right of action existed. Or, if the enterprise and undertaking represented by the agreement of the parties was interdicted by law, a like consequence would necessarily follow, since recovery of damages for breach of a prohibited contract could not be had. If either result obtained here, the appellee was entitled to a peremptory instruction; and this court, after the most careful consideration of this voluminous record, and of the able briefs and arguments submitted in behalf of both litigants, has reached the conclusion that both these stated conditions have been shown. That being true, it necessarily follows that the trial court's judgment in favor of appellee was the only proper judgment that could have been rendered upon the entire record made, and that a detailed treatment of appellant's various assignments, and of the many errors committed upon the trial, which they undoubtedly disclose, is unnecessary, all such errors becoming immaterial. Indeed, but for our conclusion that no other judgment could properly have been rendered below, the errors committed would require a reversal of the judgment.

Our discussion will therefore be confined to these two fundamental questions, either one of which we think determinative of appellant's right to maintain this suit, and of the merits of this appeal; and they may in substance be restated as follows: (1) Did the contract or agreement require, as conditions precedent to the imposing of its obligations upon either party, the obtaining of the right of way and connection therein provided for, and, if so, were such obtained? (2) Was the contract, or the performance of it in the manner contemplated illegal?

In determining the first question, the most pertinent provisions of the contract relating to right of way and connection must be looked to. They are as follows:

"The vendor agrees to use his best efforts to obtain a right of way for a railroad from the southern terminus of the proposed railroad on the vendor's land, shown on the map hereto attached, to the north end of what is known as the 'Salt Works Spur' on the International & Great Northern Railway, a distance of approximately six (6) miles, together with a connection with said railway at said Salt Works spur, by which the lumber cut and carried from the said vendor's land may be transported to and conveyed over International & Great Northern Railroad. * * * It is understood and agreed that the railroad shall be constructed at the expense of the vendor, shall be of standard gauge, using a rail of not less than fifty-six (56) pounds, and shall be built in the manner adapted to the purposes of this contract."

When the subject-matter of this contract, the situation between, and the purposes of, the two parties to it are considered, as they should be in arriving at the true meaning of the instrument, we are unable to see how it could mean anything else than that the right of way for the proposed railroad, and a physical connection of its tracks with the tracks of the International & Great Northern Railroad Company at the north end of that company's Salt Works spur must be first obtained. Ball owned and wanted to sell the timber. Ryan was in the timber manufacturing and sawmill business, and wanted to buy it; but it was necessary to build a railroad into it from another railroad to get it out, and to afford this outlet, as a part of their contract of sale and purchase of the timber, it was further agreed that Ball, immediately upon giving notice to Ryan that he had secured the right of way and connection, should with all reasonable diligence commence and continue the construction of such railroad from the north end of the Salt Works spur above mentioned to a terminus upon Ball's land, keeping the railroad building from time to time one mile ahead of the cutting of the timber.

[1] Testing the language used in the light of all these surrounding conditions, it seems plain that an ordinary right of way from the owners of the necessary land to be traversed and a rail-to-rail physical connection with the International & Great Northern Railroad Company's spur track was meant, and only that. How any other connection between two standard gauge railroads, by and over which lumber could be transported and conveyed

from one to the other, could have been in mind does not occur to us. When you speak of connecting one such railroad to another so. that trains may pass over the connection a physical joining of the rails is necessarily contemplated.

[2] And that the obligations of the entire contract were contingent upon whether such right of way and connection between the proposed road and the International & Great Northern's spur could first be obtained, we think is equally clear; in fact, this contingency not only inhered in, but by necessary implication constituted, the real meaning of the contract. Nor are we without direct light upon the subject, for the intention and understanding of both parties themselves is plainly stated. Ball testified:

"The situation in respect to the necessity of this railroad connection and the railroad right of way before the contract should ever take effect was discussed thoroughly between Mr. Ryan and myself. I was to secure the right of way to build the railroad to the Salt Works spur, and make connection with the Salt Works spur, and get an arrangement or contract or agreement from the International & Great Northern Railroad to handle standard equipment, and this road was to be standard gauge road, and Ryan was to operate and maintain it and we were to have the privilege of running cars out over it. In the event that I did not get the right of way or connection the contract certainly was not ever to be final; that was thoroughly understood between Mr. Ryan and myself; that if I could not get the right of way or could not build the railroad, and could not get the connection, that the trade was off, and that was understood all through our negotiations, and Mr. Ryan said that if I could not get the connection with the International & Great Northern he did not want the railroad; that it would not do him any good. Mr. Ryan wanted a connection with the International & Great Northern rails so that he could run his cars right out on the International & Great Northern to save reloading. That was a part of the agreement of Ryan with me. Under this contract or agreement of March 20th, he was entitled to that, and I was also entitled to it under that agreement. If I had got any railroad built I would have wanted a physical connection. I wanted a connection for running cars without reloading them. I never did, at any time, in writing, orally or otherwise, agree to build the railroad unless I could get a physical connection and operative contract with the International & Great Northern."

Likewise, Ryan's testimony was:

"Now, in discussing this with Ball before this contract was entered into, we must have discussed the necessity of his getting the right of way. We discussed the necessity of him getting a railroad connection, because if he did not build the railroad for me I was not interested in the contract; and that day in St. Louis, when I saw Mr. Ball at his office in the morning, before I went to Mr. Swarts' office, those matters were understood between Mr. Ball and myself, that he was to build the railroad and have it all ready to run trains over, and it was understood between him and me that morning before I went down there to sign the contract that he must get the right of way, and that he must get the railroad connection, so as to enable us to move our freight over the International & Great Northern before either of us would be bound. That is the way I understood it, and is the way I understood the contract

after it was written. Without those conditions, to wit, the right of way, and without railroad connection, and the contract, I would never have entered into that contract. And I understood that my obligations to Mr. Ball were contingent upon his getting this right of way and connection."

If, therefore, neither of the contracting parties, in using the language quoted from their agreement, had any idea that he was binding himself or the other unless and until this essential right of way and connection had been first obtained, and the apparently inherent and inevitable force of the conditions under which, and the subject-matter about which they were thus contracting fully complemented their specifically declared meaning, purpose, and understanding, how can it still be said that they meant anything else? If Ryan, as he himself says, was not to be bound, in the absence of such conditions precedent, how could he, under exactly the same circumstances, hold Ball? The mere asking is the answer to both questions. It is perfectly clear, we think, that if this suit, instead of being one by Ryan for breach of this contract of sale of timber to him, had been one against him by Ball for specific performance thereof, on identically the same state of facts, it would have been a complete answer for him to say:

"You have never obtained the necessary right of way and connection, the timber is worthless to me without them, and the consideration for my obligation to take it has failed."

[3] It only remains to inquire whether the right of way and connection ever were in fact secured; and the uncontroverted evidence shows that they were not. We are aware that the jury found, and it may be conceded upon sufficient evidence, that Ball's failure to secure the right of way by May 28, 1912, was due to Ball's instructions not to secure it; but that does not affect the result, because it otherwise conclusively appears that he neither did nor ever could have secured it, for the simple reason that the connecting link between the proposed road and the International & Great Northern Railroad Company's spur on the latter company's land was a necessary part of it, and the International & Great Northern Railroad Company at all times not only refused to concede this right of way, but also declined to permit the contemplated connection with its spur.

It is unnecessary to detail any evidence, because the facts supporting this conclusion are undisputed. But appellant pleads:

"That at all times from the date of the contract the defendant (Ball) was entitled to the connection desired from the International & Great Northern Railway, under state and federal statutes, and such connection could at all times have been compelled at defendant's option."

[4] We are not favored, however, with citation of any authority upholding any such right. Ball was an individual and acting in that capacity; as such, he neither had the

right of eminent domain, nor to condemn the right of way, and enforce a physical connection for his road with another railway. The power of eminent domain is a sovereign power, and while it may be delegated by the Legislature for public uses, such grants are strictly construed, and can be exercised only by such donees of the power as are expressly named in the statute. The Legislature of Texas has never granted this power to an individual for the purpose of acquiring a right of way for a railroad, but has given it to railroad corporations. Constitution of Texas, art. 1, § 17; Revised Statutes, arts. 6504 to 6530, 6481; Lewis on Eminent Domain, §§ 237, 254; International Bridge Co. v. McLane, 8 Tex. Civ. App. 665, 28 S. W. 456; Cooley's Constitutional Limitations (7th Ed.) pp. 759 to 762.

Upon the threshold of a consideration of the second question, we are confronted with article 6406, Vernon's Sayles' Statutes, later herein quoted in full. Before applying it, however, it is appropriate to say that appellant was a corporation chartered under the laws of the state of Tennessee; that it was never chartered in Texas, but that as a foreign corporation it was admitted to do business in Texas to the extent and for the purposes as follows:

"The business of manufacturing logs into lumber and for the purpose of conducting sawmills and planing mills."

Ryan, its president, testified:

"The permit is dated December 30, 1912. I presume that is correct. Up to that time the Ryan Lumber Company had no permit to do business in the state of Texas, and it never was chartered in the state of Texas. Those are the only papers we have. By all the papers we have I mean the charter from the state of Tennessee and the permit to do business in Texas, dated the 30th day of December, 1912."

[5] It thus appears that appellant had not even taken out this permit to do the kind of business in Texas it was thereby authorized to do until long after this contract had been made; and, aside from the suit itself being tantamount to an assertion of its right to recover under its legal status as thus shown, it otherwise fully appeared from the evidence that at all times, as such foreign corporation, it contemplated carrying out upon its part the obligations, whatever they were and whenever imposed, of the contract or agreement of March 20, 1912. Not only is there in this record neither pleading, proof, nor suggestion in any other form of a single fact from which any presumption could be indulged that it ever intended to reincorporate in Texas so as to meet the requirements of Revised Statutes, art. 6406, but it thus affirmatively appears that the purpose at all times was to execute its part of the contract in its capacity as a Tennessee corporation, with only the limited powers already mentioned under its permit as such to do business in Texas; indeed, there is no dispute about this by appellant. It simply contends that the bar

of this statute does not apply to such a railroad as this one was to be, nor to such limited use of and privileges in it as appellant was to have under the agreement. It therefore only remains for us to determine whether or not the statute does apply to that kind of a railroad and such character of use thereof. And in answering the conjunctive part of this question, it is wholly immaterial by what names the acts of the appellant are called, that is, whether or not its agreement was to "operate, acquire, own or maintain the railway," in the exact language of the statute; but the test is, whether the acts and things it was to do amounted to the same thing, and come within the inhibition of that law. Appellant's exact position upon this question is thus presented in its written argument filed in this court:

"Appellee's attack on the contract written by his own counsel as violative of public policy under article 6406 is without foundation. Reasonable minds cannot differ that the only basis for the attack is that the contract grants a foreign corporation the right to use a switch or spur for its own benefit in the operation of cutting timber and running a sawmill. It is unthinkable that any court will ever hold that a timber and lumber company becomes a railroad corporation subject to the provisions of title 115, including article 6406, of the Revised Statutes, merely because it uses for its own private benefit a switch or spur track belonging to an individual in the conduct of its business and keeps the switch or spur track in repair. However, we are not without precedent on this inquiry. It was expressly held in Aycock v. S. A. Brewing Association, 26 Tex. Civ. App. 343 [63 S. W. 953], that a street railroad company, incorporated for the transportation of freight in a city, was not operating a railroad in contemplation of title 115 (then title 94), by reason of the fact that its line was used by a brewing company in the transportation of its freight by means of steam locomotives and cars. In B. S. L. & W. Ry. Co. v. Moore, 174 S. W. 847, it was determined that such a spur as this contract required for appellant's use could be made subject to a lumber company's exclusive control, and that no rights or duties to the public, such as title 115 is designed to safeguard, would be involved. In rejecting the contention that a member of the public could complain of a refusal of shipping facilities over such a spur, it was said: 'The spur in question was a private track built for the sole and special use of the lumber company, and was under the exclusive control of that company. The railroad company could not, without violating its contract with the lumber company, which had assisted in the construction of the spur, place cars thereon for the use of shippers generally, unless by permission of said company.' B. S. L. & W. Ry. Co. v. Moore, 174 S. W. 847. These cases are in line with the decision of the Supreme Court in Railroad Commission v. St. L. S. W. Ry. Co., 98 Tex. [67, 80 S. W. 141], that 'it was not intended to require railroad companies to construct' switches and spur tracks 'away from their lines to accommodate individuals.' It logically follows that such tracks may be provided and used, under private contract, like other necessary facilities to cut and move timber and lumber. The following cases uphold and enforce just such contracts as that sued upon in so far as the rights of appellant thereunder are concerned: M., K. & T. Ry. Co. v. Carter, 95 Tex. 461–474 [68 S. W. 159]; U. P. Ry. Co. v. C., R. I. & P. Ry. Co., 163 U. S. 564 [16 Sup. Ct. 1173], 41 L. Ed. 265; T. & F. S. Ry. Co. v. T. & N. O. Ry. Co., 28 Tex. Civ. App. 551, 554 to

555 [67 S. W. 525]; Graham v. Railway Co. [111 Ark. 598], 164 S. W. 729; Lumber Co. v. Railway Co., 36 Tex. Civ. App. 563 [82 S. W. 816]; S. A. & A. P. Ry. Co. v. Tracy [61 Tex. Civ. App. 574] 130 S. W. 639; Stolle Stone Co. v. M. P. Ry. Co. [189 Mo. App. 683], 175 S. W. 250."

But after carefully reviewing the authorities thus cited, we are convinced that they have no application to the situation here involved; the principle declared in those cases was, simply, that railroad companies could neither be compelled to construct switches and spur tracks away from their lines to accommodate individuals, nor to respond in damages to individuals from refusal to furnish cars to and accept freight from them at privately owned spurs, in which they had no interest; but in discussing the particular question now before us, our Supreme Court, in the case of Cunningham v. Neal, 101 Tex. 338, 107 S. W. 539, 15 L. R. A. (N. S.) 479, expressly held that such a railroad as this one was to be, and operated in a similar manner by a company in other than railroad business, was included within the meaning of the fellow-servant law then in force (article 4560f). In that opinion the Supreme Court cited and approved the case of Lumber Co. v. Taylor, 39 Tex. Civ. App. 302, 87 S. W. 358, in which the Court of Civil Appeals for the Third District had held that "railroad" was used in the same sense in that fellow-servant act (article 4560f), as it was in the act relating to injuries resulting in death, then article 3017, now article 4694, of Vernon's Sayles' Statutes; likewise, and following Lumber Co. v. Taylor and Cunningham v. Neal, the Court of Civil Appeals for the Fourth District, in Kirby Lumber Co.'s Receivers v. Owens, 56 Tex. Civ. App. 370, 120 S. W. 936, held that a standard gauge logging spur, or tramroad, owned and operated by a lumber company, leading from a commercial railroad to its plant and timber, and used for transportation of its products and supplies, was a railroad within the meaning of the last-mentioned article, then 3017, now 4694. A writ of error was refused by the Supreme Court in that case, and the same question was presented to this court in the case of Rice & Lyon, Receivers, v. Lewis, 59 Tex. Civ. App. 273, 125 S. W. 961, and it was there held that, by its refusal of a writ of error in the Owens Case, the Supreme Court had directly approved that decision of the question, and this court accordingly refused to further consider the question, but held it must be treated as settled by the Supreme Court's action. A writ of error has also since been denied in the Lewis Case.

[6] If, therefore, a lumber company so owning and operating a logging or tramroad is in charge and control of a railroad within the meaning of the statutes referred to, we can see no reason why appellant, under the agreement it here undertook, would not have been under the bar of article 6406, Re-

197 S.W.—66

vised Statutes of Texas, passed by the Legislature in 1903 (Acts 1903, p. 90), and in effect ever since, reading as follows:

"No corporation, except one chartered under the laws of the state of Texas, shall be authorized or permitted to construct, build, operate, acquire, own or maintain any railway within this state."

Recurring now to the parts of the contract descriptive of the character of the road and of the things appellant was to do in connection with it, we quote as follows, italicizing where it seems pertinent in emphasis of the matter under consideration:

"The vendor agrees to use his best efforts to obtain a right of way for a railroad from the southern terminus of the proposed railroad on the vendor's land, shown on the map hereto attached, to the north end of what is known as the 'Salt Works Spur' on the International & Great Northern Railway, a distance of approximately six (6) miles, together with a connection with said railway at said Salt Works spur, *by which the lumber cut and carried from the said vendor's land may be * * * conveyed over International & Great Northern Railroad.* * * * It is understood and agreed that the railroad shall be constructed at the expense of the vendor, shall be of standard gauge, using a rail of not less than fifty-six (56) pounds, and shall be built in the manner *adapted to the purposes of this contract.* It is understood that the vendor is under no obligation to purchase or furnish either cars or locomotives, and it is further understood and agreed that *the purchaser, during the term of this contract, shall keep the railroad in repair.* It is understood and agreed that after said vendor shall have built said railroad or any part or section thereof, that *the purchaser shall be liable for any accident or injuries which* may result to any person whatsoever *in the conduct* of said railroad. It is understood and agreed that the vendor shall not be liable for any accident or injury which *the purchaser or any agent or employé of the purchaser* may suffer by reason of traveling or in any *way using said railroad* or any part thereof. * * * For the purpose of felling, cutting down and carrying away of said timber the vendor gives the right of entry *and right of way* to the purchaser, his servants, agents, workmen, and trains through and over and upon said premises, *so far as said entry and right of way may be for the purposes of the within contract.* It is understood and agreed that *subject to the use of said railroad for the purposes herein contained by the purchaser,* the vendor reserves to himself the right to operate trains over said railroad at any time and all times and for such purposes as to him may seem best. At the termination of this contract the purchaser shall have the right to remove all improvements by him erected on said land, including machinery and fixtures, it being understood that said right shall not include the right to remove said railroad *or any repairs thereon.*"

In explanation of what he meant to undertake under these paragraphs of the agreement, appellant's president testified:

"I understood from that that we were to operate the railroad so far as removing the timber is concerned; that we were to furnish our own engines, cars, and trains; that we were to buy all equipment and furnish employés to operate it on this road; and that I was to exempt Mr. Ball from any liability for any accident that happened on that road, under our operation of the road. I exempted him from any liability, and if there was any responsibility it would be on me. I further understood that that road was

to be operated by us for the purpose of this contract and during the life of this contract to get out material, to get out the timber that we were going to cut, and to bring in our supplies, too. I further understood by this contract that we were to maintain the railroad and to keep it in repair at our own expense. I understood by it that I was to acquire this railroad for the purpose of this contract, but I did not own the railroad. I acquired the use of it."

Without further discussion, it seems to us the doing of the very thing denounced by the statute was confessedly contemplated. It is immaterial that the railroad was to be owned by Ball, who, under the laws of Texas, was without the power of eminent domain. It was still a railway within the meaning of the above-quoted statute, and the appellant in carrying out the purposes of such contract would have been undertaking to acquire, maintain, and operate a railway within the meaning of the law. This purpose was clearly illegal and contrary to the public policy of the state of Texas. R. S. art. 6406; Cunningham v. Neal, 101 Tex. 338, 107 S. W. 539, 15 L. R. A. (N. S.) 479; Lumber Co. v. Taylor, 39 Tex. Civ. App. 302, 87 S. W. 358; Kirby's Receivers v. Owens, 56 Tex. Civ. App. 370, 120 S. W. 936; Receivers v. Lewis, 59 Tex. Civ. App. 273, 125 S. W. 961.

It is contended in appellant's brief, however, that upon a former appeal in the litigation over this same contract, the Court of Civil Appeals for the Fourth District, in Ryan Lumber Company v. Ball, 177 S. W. 226, held differently to the conclusions we have stated upon the legal meaning and effect of this contract; but an analysis of that opinion will not, we think, sustain the contention. That court did not pass upon either of the questions herein decided, because neither was presented to it. The issues there determined were that the following issues should have been submitted to the jury: (1) Was the time within which notice was to be given about securing right of way and connection extended, waived, given, or was the contract to continue in force, that clause eliminated? (2) What was the status of E. H. Craig as between Ball and Ryan, and was he Ball's agent or middleman? (3) Did the

evidence show a repudiation of the contract by plaintiff in that suit? Further, that no interest in the land upon which the timber stood was conveyed, nor was the description of the land void for uncertainty; and, lastly, that Vernon's Sayles' Ann. Civ. Statutes, 1914, arts. 1314, 1318, requiring that foreign corporations secure permits before doing business within the state, did not prevent a foreign corporation, which had not procured a permit, from contracting to buy timber located in this state, in contemplation of doing business in this state. It seems that the contract was there construed by both parties as meaning that the attaching of its obligations was conditioned alone upon the giving of the notice therein specified, and that the court, in deciding that appeal, accordingly so treated it; indeed, such is likewise appellant's position upon this appeal also, and its counsel arraigns appellee's counsel for an alleged change of viewpoint between the two appeals as to the proper interpretation and effect of the contract.

While these matters are in no way material to any issues here involved, they are mentioned merely in emphasis of what has been already stated, that the objections to the contract herein treated were not before the San Antonio court upon the other appeal. Especially is it to be noted that its holding that a foreign corporation, without first procuring a permit to do business in Texas, is not prevented by Revised Statutes, arts. 1314, 1318, from contracting to buy timber located in Texas, in contemplation of doing business here, is very far from deciding that a foreign lumber corporation with nothing but a permit to do a lumber and sawmill business in Texas could in that avowed capacity acquire, operate, and maintain a standard gauge railway within this state, in the face of our above-quoted statute directly prohibiting it.

Having thus concluded that the action brought could not be maintained for the reasons given, it follows that the trial court's judgment should be affirmed, and it has been so ordered.

Affirmed.