## TURNER v. TEXAS & N. O. RY. CO.
### No. 9830.

Court of Civil Appeals of Texas. Galveston.
March 29, 1933.

Rehearing Denied April 20, 1933.

John & Levy, of Houston, for plaintiff in error.

Baker, Botts, Andrews & Wharton, John P. Bullington, and Tom M. Davis, all of Houston, for defendant in error.

GRAVES, Justice.

A statement of the nature of and issues in the case, mutually conceded to be correct, is thus taken from the briefs:

"Defendant-in-error's first amended original petition declared upon a written contract between defendant-in-error, the Dayton & Goose Creek Railroad Company and plaintiff-in-error, dated June 21, 1927, the agreement being termed an 'Agreement for Industry Track,' which provided among other things that the Dayton & Goose Creek Railway Company and defendant-in-error would construct a certain siding not to exceed 1380 feet in length to connect with the main track of the Dayton & Goose Creek Railway Company at Mt. Belvieu, Texas, and would lease 700 feet of such track to plaintiff-in-error in consideration of plaintiff-in-error paying an annual rental equal to 6% of the agreed value of the track, which value was agreed to be Two Thousand and 93/100 ($2,000.93) Dollars, or the sum of $120.06 per annum, payable in advance, and further provided that plaintiff-in-error would bear the expense of keeping in repair the track, which expense was agreed to be ten cents per track-foot, or the sum of $70.00 per year. Defendant-in-error further alleged that the agreement was duly executed and authorized by law and that the track was constructed and that plaintiff-in-error had the use of the track from June 21, 1927, to date but has failed to pay any rental or expense, to the damage of defendant-in-error in the sum of $746.18, with interest at 6% from June 21, 1927.

"Defendant-in-error further declared upon a lease between the Dayton & Goose Creek Railway Company, defendant-in-error and plaintiff-in-error dated June 15, 1927, wherein a tract of land, owned by the Railroad, 300 x 60 feet, adjoining 700 feet of the new track to be built, was leased to plaintiff-in-error at an annual rental of $12.00 per year, payable in advance; that plaintiff-in-error has refused to pay such rental, to their damage in the sum of $49.15, with interest at 6% from June 15, 1927, which sum is secured by a lien on the improvements placed by plaintiff-in-error upon the property.

"Defendant-in-error then asks for judgment and foreclosure of its lien, attorney's fees, and general relief.

"Plaintiff-in-error, by original answer, generally demurred to the cause of action, and as a special defense alleged that the contract styled an 'Agreement for Industry Track,' was unenforceable as it was without consideration, in that at the time defendant-in-error constructed the track the traffic conditions and freight tendered at Mt. Belvieu made it the legal duty of defendant-in-error to construct such trackage without charge to plaintiff-in-error; that before the promise was made, defendant-in-error had been notified by plaintiff-in-error that he had large quantities of rice to be shipped to other points in Texas and that he would need about twelve cars a day which could not be accommodated on the small trackage facilities then existing at Mt. Belvieu; that defendant-in-error had refused to construct the additional tracks unless plaintiff-in-error agreed to pay for part of the construction and the maintenance, although plaintiff-in-error had within a reasonable time requested such additional cars and track.

"As further answer to the cause of action based upon the lease of land adjoining the track, plaintiff-in-error alleged that he had delivered to defendant-in-error a check to cover the rental due under such lease.

"The entire answer was sworn to by plaintiff-in-error.

"Defendant-in-error, by supplemental petition, filed special exceptions to the answer of plaintiff-in-error, but they were never presented to the court.

"Defendant-in-error filed a trial amendment, alleging that the lease of the land adjoining the track had been canceled by their notice to plaintiff-in-error, dated January 25, 1930, but that plaintiff-in-error had not vacated, and they asked for judgment from January 25, 1930, at the rate of $12.00 per

year as the reasonable rental value. Defendant-in-error then pleaded in the alternative that the lease was terminated by the filing of the suit, and asked for an annual rental of $12.00, and further in the alternative, if the lease was not terminated, the contract rental was $12.00 per year. Defendant-in-error also pleaded that it was entitled to rental on the industry track from July 21, 1931, on a quantum meruit count.

"At the close of the evidence, the trial court directed a verdict against plaintiff-in-error and in favor of defendant-in-error, upon the due return of which judgment went in the latter's favor.

"The sole issue involved in the case was whether or not the 'Agreement for Industry Track,' executed by and between Dayton & Goose Creek Railway Company, Texas & New Orleans Railroad Company, and E. W. Turner, was based on a valid consideration. It was conceded that plaintiff-in-error's only defense on the trial below was that there was not sufficient legal consideration to sustain plaintiff-in-error's promises and agreements made in the contract, the following agreements being made:

" 'We have only one defense in the case, that we are not liable to pay that money, because of the lease of itself, and we concede all points except the question of whether or not there is sufficient consideration in law for our promise to pay for the side track and the plaintiff occupy all the side track.'

" 'It is agreed and stipulated by and between the parties that the amount of rental. stated in plaintiff's original petition is the correct amount for rentals accruing under the contract, if defendant is liable for any rentals at all under such contract; and that the additional amounts declared on in plaintiff's first amended original petition is the fair and reasonable value for the use of such track, if defendant is liable for any amount whatsoever for the use of such track.

" 'It is further agreed that a trial amendment may be filed by plaintiff declaring upon quantum meruit for the reasonable value of the use of the trackage from and after the date of the attempted cancellation, and the defendant will be permitted by a trial amendment to file any proper reply if he desires to do so, and such trial amendment may be considered as filed nunc pro tunc.

" 'It is also stipulated that plaintiff's original petition is considered in evidence for the use of all parties with reference to the foregoing stipulation.' "

Likewise in this court, through a number of propositions, plaintiff in error reiterates as a ground for a reversal of the judgment so rendered against him his sole substantive contention below: "The defendant-in-error, in building this additional trackage, was only doing what it was already legally obligated to do, and the plaintiff-in-error received no benefit from this additional trackage, other than what he was entitled to receive as a member of the public offering freight for shipment at Mt. Belvieu, Texas."

Whatever might be said anent the other questions argued, this court concludes that this presentment cannot be sustained, under the facts appearing, for the reasons thus stated in the railroad company's counter propositions:

"(1) The undisputed evidence in this case shows that defendant-in-error agreed to and did furnish, and plaintiff-in-error contracted to pay for and did obtain, an industry-track over which, as against both the public and defendant-in-error, he had preferential use for the accommodation of his individual interest; so that, even assuming that the transportation facilities at Mt. Belvieu at the times in question were inadequate, nevertheless plaintiff-in-error cannot avail himself of that fact, since defendant-in-error's only statutory or common-law duty in that regard was to provide adequate facilities open to all members of the public alike, and it did not owe any duty of providing additional facilities designed and constructed for, and capable only of, preferential use by one shipper."

"(2) Defendant-in-error, having constructed 700 feet of industry-track for and designated it to plaintiff-in-error's preferential use, was bound and obligated to exact of plaintiff-in-error a reasonable charge for the use of that track; otherwise, it would have amounted to the granting of an illegal and unlawful preference to plaintiff-in-error and to an illegal and unlawful discrimination against the other members of the shipping-public, who were not given similar special facilities for their own individual use."

The "agreement for industry tracks" provided, in substance, that the railway would construct 1,380 feet of side track; that Turner desired the use of 700 feet of it, and that the railway granted him that use under certain specified terms and conditions, article X, subdivision (a), thereof being as follows: "The right is given the first party (railroad) at any time to make use of said trackage for the purpose of receiving and delivering freight from and to other patrons, to spring other tracks therefrom, to shift and to extend the same; provided, such use or any extension thereof shall not unreasonably interfere with the second party (plaintiff in error) in its use thereof."

Ground was also contemporaneously leased to him along 300 feet of this 700 to build his warehouse on, and he not only then took possession of the 300 feet, but built his warehouse thereon at the same time the railway laid the track.

He then sublet one portion of this warehouse to a lumber company, which used the

track in front of and adjoining it, likewise leasing another portion thereof to a cement company, with whom it was contemplated that the latter too would use this track, which it also did, and its use thereof made the warehouse more valuable to that company than it otherwise would have been.

He got rents from both of these subleases, the lumber company paying him $50 per month, and the cement company $35 per month, while he was only obligated to pay the railway company $12 per year as the rental for the land on which the warehouse was so constructed.

Mr. Turner, while testifying, admitted that the location of the warehouse along the railway track made it impossible for any one to use the track where the building was located, except those shipping to or from his warehouse; further, that there had been two proposed contracts, one whereby he could have exclusive use of the track he desired, paying the railway for it, or he could have merely preferential use and pay only 6 pr cent. of the cost of the track, and this latter was the agreement finally made.

He further testified that the railway never shoved out any of his cars to get them out of the way for the benefit of the general public, and whenever he wanted to use the track alongside his warehouse, it was always available for that purpose.

He also said he understood that he had the preferential use of the track by his warehouse with a portion on each side, that is, that he and the farmers had it, and that he acted for the farmers, saying in this connection, "there couldn't anybody get on the track except stuff going through the warehouse."

The assistant to the general manager of the railway company, in outlining what occurred between the parties in negotiating and making the contract, among other details, testified: "I explained to him that the railroad company, of course, always provided track facilities free of charge to the patrons where it was a public track and used in common alike by everybody, and he had the opportunity to ship or unload at the station, but if it was a case where he wanted a track to serve a warehouse, which he wanted to construct, that he would, of course, have to pay a charge for the track; that we could not consistently build a track free of charge without doing the same thing for everybody alike; that that was a customary procedure with respect to requests that came in for tracks to serve private industries and preferential service such as would be necessary in serving a warehouse where he proposed to construct it at that point. * * * In the discussion Mr. Turner explained that he would, of course, want preference there, because he was building the warehouse and he wanted the track available to spot cars in which to load rice

passing through his warehouse when they were ready to load it, or wanted to unload it. I think that was the only conversation I ever had with Mr. Turner, and the contract which was finally entered into between the railroad company and Mr. Turner was the outgrowth of that conference."

He added that Mr. Turner never requested a team track for public use, but stated he wanted one that would serve his warehouse to be constructed, and that he wanted a track that would be available to him at all times for his own use, and that he could not carry out his plans without having a preferential use thereof; that when the difference was explained to him between the facilities offered in public team tracks and preferential tracks for serving a particular individual, Mr. Turner replied: "That his business would require a track on which he would have preference; whenever he had cars to load or unload he wanted the track available for him subject to his use at any time."

He stated that it is a general practice in the railroad business to require pay for building a track which is for the preferential use of a particular shipper, and that, if Mr. Turner had merely requested a team track at that point for his own benefit and that of the shipping public in general, it would have been granted.

Mr. Turner and the farmers whom he represented, and who through him used his warehouse and its appurtenant track he had so obtained from the railroad company, were engaged in the rice business, and several witnesses in his behalf testified in a rather general way to having seen other commodities than rice, lumber, and cement—the three products thus handled by himself and his two sublessees—unloaded on the 1,380-foot spur track, but they all particularized that none of these had been unloaded at or right opposite to this warehouse, and none of them testified to ever having seen the general public allowed to use that portion of the track.

It thus from the evidence as a whole conclusively, if not undisputedly, appears that in the negotiation of the express declaration in (by way of the quoted provision from article X, subdivision a), and the subsequent acts of the parties under this contract, that Mr. Turner both bargained for and received in fact a preferential use of 700 feet of the spur track, in that neither the railroad company nor members of the public in general were ever expected to or ever had interfered with his particular and individual use thereof for the advancement of his own private interests; that being true, it follows as a matter of course that this 700 feet of the track in front of and adjoining his warehouse so designed for and devoted to his individual use exclusively was not a public track.

The legal consequences flowing from this

situation are, as stated in the quoted counter propositions, that the railroad company never owed him any duty of providing him such preferential facilities gratis, nor was even permitted ·to do so, since that would have amounted to an unlawful discrimination in his favor as against other members of the shipping public not accorded the same privileges.

It is not deemed necessary that an attempt be here made to again demonstrate that such is now the law in Texas, as it is believed to be well settled under these statutes and decisions: Railroad Commission of Texas v. St. Louis Southwestern R. Co. of Texas, 35 Tex. Civ. App. 52, 80 S. W. 102, writ of error denied; Railroad Commission of Texas v. St. Louis Southwestern R. Co. of Texas, 98 Tex. 67, 80 S. W. 1141; Crosbyton-Southplains R. Co. v. Railroad Commission of Texas, 169 S. W. 1038 (Austin Court of Civil Appeals 1914, writ of error refused); Ryan Lumber Co. v. Ball, 197 S. W. 1037 (Galveston Court of Civ. App. 1917); Beaumont, S. L. & W. R. Co. v. Moore, 174 S. W. 844 (Galveston Court of Civ. App., writ of error denied); article 6515 and .article 6474, subd. 1, Revised Civil Statutes of Texas, 1925.

In view of the sole issue to which the litigation was reduced by the stipulations of the parties, it follows that, on the coming in of the facts stated, the judgment of the learned trial court was the only one that could have been properly rendered; it will accordingly be in all things affirmed.

Affirmed.